**OVERSEAS NATIONAL AIRWAYS, INC., Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent,**

**Saturn Airways, Inc., Universal Airlines, Inc., Seaboard World Airlines, Inc., Intervenors.**

No. 683, Docket 33851.

United States Court of Appeals, Second Circuit.

Argued April 3, 1970.

Decided May 25, 1970.

———◆———

Leonard N. Bebchick, Washington, D. C., for intervenor Saturn Airways, Inc.

Stephen D. Potts, Washington, D. C., for petitioner.

Paul Y. Seligson, Washington, D. C., for intervenor Universal Airlines, Inc.

———

* Chief Judge of the District of Connecticut, sitting by designation.

John Michael Roach, Atty., Civil Aeronautics Board (Richard W. McLaren, Asst. Atty. Gen., Howard E. Shapiro, Atty., Dept. of Justice, Joseph B. Goldman, Gen. Counsel, Civil Aeronautics Board, O. D. Ozment, Deputy Gen. Counsel, Warren L. Sharfman, Associate Gen. Counsel, Litigation and Research, on the brief), for respondent.

Dudley B. Tenney, New York City, (Cahill, Gordon, Sonnett, Reindel & Ohl, Irwin Schneiderman, Philip R. Forlenza, New York City, Fisher, Gelband & Rodriguez, Washington, D. C., on the brief), for intervenor Seaboard World Airlines, Inc.

Before KAUFMAN and FEINBERG, Circuit Judges, and TIMBERS, District Judge.*

FEINBERG, Circuit Judge.

■ Petitioner Overseas National Airways, Inc. ("ONA") and intervenors Saturn Airways, Inc. and Universal Airlines, Inc., collectively referred to as petitioners, seek review of two orders of the Civil Aeronautics Board, which refused to expand the scope of a proceeding before the Board. We hold that the orders are not final, and accordingly dismiss the petition for review.

I.

Petitioners are all parties in the *Transatlantic Supplemental Charter Authority Renewal Case*, Docket 20569, which was instituted in December 1968 by the CAB, Order 68–12–93, in response to the applications of ONA, Saturn and four other supplemental, or charter, carriers.[1] The purpose of the proceeding as initially defined by the Board was to consider "the renewal of existing authority" held by the six applicants to provide transatlantic passenger charter transportation. In June 1969, by Order 69–6–25,

———

1. "Supplemental air transportation" means "charter trips in air transportation." 49 U.S.C. § 1301(33).

the Board consolidated with Docket 20569 various other applications for transatlantic passenger charter authority submitted by carriers who do not now have such authority; Universal is one of these additional applicants.

What has prompted petitioners to seek review is the Board's refusal to expand the scope of the proceeding before it to include consideration of the related, but hitherto distinct, subject of transatlantic cargo charter authority. In its original Order 68–12–93, the Board refused to consider those aspects of petitioners' applications which sought transatlantic cargo charter authority, and dismissed that portion of the applications without prejudice. The Board's stated reason was "to limit the scope of this proceeding, thereby avoiding undue complication of the issues and delay." After petitions for reconsideration had been filed, the Board did expand the scope of the proceedings somewhat, as has already been noted, to include consideration of applicants for transatlantic passenger charter authority not previously granted such authority, and in various other ways not here relevant. However, the Board held fast in its determination not to inject cargo charter questions into Docket 20569. In its Order 69–6–25, the Board noted that it had considered the question of transatlantic cargo charter authority less than three years before, and it was not convinced that "the present proceeding should be expanded to include a further review of that issue at this time." In the earlier case referred to by the Board, the *Supplemental Air Service Proceeding*, Docket 13795, the Board had continued the authority of Seaboard World Airlines, Inc., an intervenor in the present case aligned with the Board, to operate transatlantic cargo charters along with scheduled transatlantic cargo flights.

Petitioners persisted and again asked the Board to reconsider. By Order 69–9–49, dated September 9, 1969, the Board rejected arguments similar to those now presented to us, and refused for a third time to inject questions of cargo authority into the current passenger authority proceeding. The Board stated:

> The argument advanced is that, unless the Board considers the cargo-carrying competence of each applicant, it would be denying due process since the degree of an applicant's cargo ability could be a factor in its selection for licensing as a passenger carrier. We cannot accept this argument as valid and as requiring us to undertake the obviously broad expansion of the proceeding that would accompany the injection of cargo issues.

Order 69–9–49, *supra*.[2]

## II.

At the outset, we must decide whether the orders denying consolidation are interlocutory and not subject to judicial review at this time. There is also a question whether the orders are ever judicially reviewable, since they involve foreign air transportation and ultimate approval by the President.[3] The principal authority on both of these issues is Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948), in which the Supreme Court dismissed a petition to review a CAB order, issued with presidential approval, which granted one application for an overseas air route and denied another. The Court held:

> We conclude that orders of the Board as to certificates for overseas or foreign air transportation are not mature and are therefore not susceptible to judicial review at any time before they are finalized by Presidential approval. After such approval has been given, the final orders embody Presidential discretion as to political matters be-

2. Review of Order 69–9–49 is not sought, although petitioners have called it to our attention.

3. 49 U.S.C. § 1461.

yond the competence of the courts to adjudicate.

*Id.* at 114, 68 S.Ct. at 437. According to the Board, petitioners are therefore not entitled to judicial intervention. On the one hand, the orders sought to be reviewed are not "final" because they fail to "impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process." *Id.* at 113, 68 S.Ct. at 437. On the other hand, if they are "final" in the above sense, they are not reviewable because they derive their vitality "from the exercise of unreviewable Presidential discretion." *Id.*

To escape the dilemma posed by *Waterman*, petitioners attempt to place the orders in a narrow area not reached by that decision. Although the matter is not free from doubt, we have previously agreed with the District of Columbia Circuit that "the *Waterman* case does not 'govern a situation where the action of the Board, before the matter reaches the President, is beyond the Board's power to act.'" Pan American World Airways, Inc. v. Civil Aeronautics Board, 380 F.2d 770, 775 (2d Cir. 1967), aff'd by an equally divided court, 391 U.S. 461, 88 S.Ct. 1715, 20 L.Ed.2d 748 (1968). See American Airlines, Inc. v. Civil Aeronautics Board, 121 U.S.App.D.C. 120, 348 F.2d 349, 351–353 (1965).[4] Accordingly, petitioners argue that the Board exceeded its statutory authority and acted unconstitutionally when it refused to consolidate their applications for cargo charter authority. Assuming *arguendo* that this statement of petitioners' claim would avoid the problem of presidential discretion, the question remains whether the orders under attack are sufficiently "final" at this stage to allow review.

On this aspect of the case, petitioners stress the alleged interdependence of transatlantic cargo and passenger charter operations. We are told that the demand for transatlantic cargo charter service is now, and will be for the foreseeable future, too small to permit profitable operation unless this service is appended to some other activity, whether it be scheduled transatlantic cargo service like that now offered by Seaboard, or transatlantic passenger charter operations, the subject of Docket 20569. Petitioners claim that possession of cargo authority would strengthen them financially because it would increase revenues and reduce the need to fly an empty aircraft from place to place in order to pick up a passenger charter party, known as "ferry" flying. Thus, according to petitioners, the exclusion of the cargo charter issue severely prejudices their applications for passenger charter authority because they will be unable to demonstrate how they might operate at the level of efficiency which possession of cargo authority would permit.

While petitioners' economics may possibly be correct—and on that we express no view—we do not see how that transforms the orders under attack into more than threshold procedural determinations, interlocutory in nature and not now subject to judicial review. In refusing to expand the scope of Docket 20569 to include transatlantic cargo, as well as passenger, charter transportation, the Board has not suggested that the question of transatlantic cargo charter authority will remain a closed one indefinitely, with Seaboard remaining the permanent beneficiary of Board inaction. It is our understanding that the Board has merely decided to defer consideration of this complex set of issues until such time as it determines is convenient and appropriate. Moreover, it has expressed a desire not to undertake in Docket 20569 what it apparently considers would be an overly broad and premature general review of transatlantic charter policy. The Board points out that both Seaboard's

---

4. We note that we deal only with citizen carriers in this case. See Pan American World Airways, Inc. v. Civil Aeronautics Board, 129 U.S.App.D.C. 159, 392 F.2d 483, 490–493 (1968). See generally Miller, The Waterman Doctrine Revisited, 54 Geo.L.J. 5 (1965).

cargo authority and the passenger authority at issue in Docket 20569 were originally granted on an experimental basis and that neither experiment has yet produced the contemplated experience required for an informed permanent solution. Thus, the Board's threshold decision would seem to be within its discretion to determine the scope and priority of its proceedings. See, e.g., National Airlines, Inc. v. Civil Aeronautics Board, 129 U.S.App.D.C. 180, 392 F.2d 504, 509 (1968); City of San Antonio v. Civil Aeronautics Board, 126 U.S.App.D.C. 112, 374 F.2d 326, 329 (1967); Frontier Airlines, Inc. v. Civil Aeronautics Board, 349 F.2d 587, 590–591 (10th Cir. 1965). Accordingly, we are not disposed to interfere with the Board. Our reluctance to interfere is not altered by the argument that exclusion of evidence of possible revenue from cargo operations prejudices petitioners' applications for passenger authority; if reviewable at all, that point can be made when, if ever, petitioners are denied passenger authority.

However, petitioners claim that while it does not seem that the Board has ruled upon the merits of their applications for cargo authority, as a practical matter it has, and in doing so has denied them due procees. For this argument, petitioners rely chiefly on Ashbacker Radio Co. v. Federal Communications Commission, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), which we recently characterized as holding that:

> if an agency's award of one application for operating authority would be mutually exclusive as a matter of fact with the award of others before the agency, the competing applications must be considered contemporaneously.

Mohawk Airlines, Inc. v. Civil Aeronautics Board, 412 F.2d 8, 9 (2d Cir. 1969). Petitioners argue that cargo and passenger authority are "mutually exclusive" under Ashbacker because those supplemental carriers who lose out in the current transatlantic passenger charter proceeding will never be able to compete for similar cargo authority when the Board finally reconsiders that issue, since without passenger charter authority it makes no economic sense to seek cargo charter authority.

Application of the Ashbacker doctrine frequently raises complex problems. See 1 K. Davis, Administrative Law § 8.12 (1958). Whether grants of authority are truly mutually exclusive is often difficult to determine. Moreover, the claim that an Ashbacker hearing has been improperly denied presents a delicate issue of timing of judicial review. See Note, Comparative Hearings for Air Route Authorizations: Transplanting the Ashbacker Doctrine, 40 N.Y.U.L.Rev. 928 (1965). The doctrine was originally based upon "a physical mutual exclusivity of two licenses" to operate a radio station. Delta Air Lines v. Civil Aeronautics Board, 107 U.S.App.D.C. 174, 275 F.2d 632, 637 (1959), cert. denied, 362 U.S. 969 (1960). Citing the last-mentioned case, petitioners claim that the doctrine also extends to any situation where "as a matter of economic necessity," the grant of some applications precludes the grant of others; e. g., if the foreseeable traffic would support only two out of five carrier applicants. But even as expanded, the Ashbacker doctrine requires that a grant of authority to X do more than merely lessen the probability of an award to Y; it must make it impossible as a practical matter. According to petitioners, this is such a case, and the Board's orders must be reversed.

We do not agree. In Delta Air Lines, supra, the competing applicants essentially sought the right to render service over the same route. The claim here that anyone denied passenger charter authority in Docket 20569 can never hope to obtain cargo authority in the future presses Ashbacker very far, because it "compares" applicants for entirely distinct services. Since this would require consideration of different economic factors, the argument immensely complicates use of the Ashbacker doctrine in air route cases, an exercise already difficult enough; one text has called application of Ashbacker in that context "confusing"

with "the equities marginal." L. Jaffe, Judicial Control of Administrative Action 445 (1965). Petitioners are already involved in Docket 20569 and may eventually obtain passenger authority, which would render their argument moot. In addition, the "mutual exclusivity" between transatlantic passenger and cargo charter applications, if such it be, is at best highly speculative. Cf. Eastern Air Lines, Inc. v. Civil Aeronautics Board, 271 F.2d 752 (2d Cir. 1959), cert. denied, 362 U.S. 970, 80 S.Ct. 954, 4 L.Ed.2d 901 (1960). We conclude that reversing the orders under attack is not compelled by *Ashbacker* and that "to do so at this stage * * * would be an invasion of the Board's function." United Air Lines, Inc. v. Civil Aeronautics Board, 97 U.S. App.D.C. 42, 228 F.2d 13, 15 (1955). See Eastern Air Lines, Inc. v. Civil Aeronautics Board, 100 U.S.App.D.C. 184, 243 F.2d 607 (1956); Frontier Airlines, Inc. v. Civil Aeronautics Board, *supra.*

Finally, petitioners urge that in excluding the issue of cargo charter authority in Docket 20569, the Board has neglected the public interest in making available the broadest degree of charter services over the North Atlantic. However, fashioning an inquiry to best serve the public interest is primarily a Board determination, and on the record before us, we do not think the Board has acted contrary to its mandate. Cf. Palisades Citizens Association, Inc. v. Civil Aeronautics Board, 420 F.2d 188 (D.C.Cir. 1969).

Accordingly, we conclude that judicial review of the orders under attack is not now warranted. The Board has not made any final determination on the merits of petitioners' applications; at this stage of the proceeding it has neither exceeded its statutory powers nor denied petitioners due process. We are asked to compel the Board to consider now the complex issues of transatlantic cargo charter authority; this we decline to do.

None of the other contentions made by petitioners warrant discussion. Because the orders complained of are not yet final, the petition for review is dismissed.