**NEW YORK SHIPPING ASSOCIATION, INC., Petitioner,**

**International Longshoremen's Association, AFL–CIO, Petitioner,**

**v.**

**FEDERAL MARITIME COMMISSION and United States of America, Respondents.**

Nos. 491–492, Dockets 73–1919, 73–1991.

United States Court of Appeals, Second Circuit.

Argued Feb. 20, 1974.

Decided April 8, 1974.

C. P. Lambos, New York City (Lorenz, Finn, Giardino & Lambos and Jacob

---

14. Nor was there any demand for a return of any portion of the premium paid.

Silverman, and Donato Caruso, New York City, of counsel), for petitioner New York Shipping Ass'n, Inc.

Thomas W. Gleason, New York City (Gleason & Miller and Julius Miller, New York City, of counsel), for petitioner Intern. Longshoremen's Ass'n.

Gordon M. Shaw, Washington, D. C. (James L. Pimper, Gen. Counsel and Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Comm., Washington, D. C., of counsel), for respondent Federal Maritime Comm.

Robert B. Nicholson, Washington, D. C. (Thomas E. Kauper, Asst. Atty. Gen., and Irwin A. Seibel, Dept. of Justice, Washington, D. C., of counsel), for respondent United States.

Ronald A. Capone, Washington, D. C. (Stuart S. Dye, Washington, D. C., Alfred T. DeMaria, and Kirlin, Campbell & Keating, New York City, of counsel), for intervenor Transamerican Trailer Transport, Inc.

Gerald A. Malia, Washington, D. C. (Ragan & Mason, Washington, D. C., and George R. Brownell, New York City, of counsel), for intervenor Sea-Land Service, Inc.

Mario F. Escudero, Washington, D. C. (Morgan, Lewis & Bockius, Washington, D. C., and Paul N. Roth, and Baer & McGoldrick, New York City, of counsel), for intervenor The Commonwealth of Puerto Rico.

Coles & Goertner, Washington, D. C., and Burke & Parsons, New York City, (Neal M. Mayer, Washington, D. C., and Raymond J. Burke, New York City, of counsel), for intervenor Seatrain Lines, Inc.

Joseph F. Kelly, Jr., New York City (Townley, Updike, Carter & Rodgers, New York City, of counsel), for intervenor Daniels & Kennedy, Inc.

Cecelia H. Goetz, New York City (Herzfeld & Rubin and Herbert Rubin, and Alan A. D'Ambrosio, New York City, of counsel), for intervenor Tranport-Gesellschaft m.b.H.

N. L. R. B., Washington, D. C. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Abigail Cooley, Asst. Gen. Counsel for Special Litigation, Peter M. Bernstein, Washington, D. C., of counsel), amicus curiae.

Before LUMBARD, FRIENDLY and TIMBERS, Circuit Judges.

FRIENDLY, Circuit Judge:

In 1968, after years of labor strife generated by the advent of automation in the longshoremen's industry,[1] the International Longshoremen's Association, AFL–CIO (ILA) and the New York Shipping Association, · Inc. (NYSA) signed a collective bargaining agreement under which the union acceded to mechanization in exchange for extensive fringe benefits intended to compensate for lost work opportunities on the waterfront. However, the 1968 plan met with collection difficulties and disagreement among association members as to the proper allocation of costs among competing modes of cargo movement. Dissatisfied with the operation of the benefit plan, the union in 1971 demanded that it be permitted to take part in negotiating a new assessment formula and collection arrangement. After initially resisting the union's demand, NYSA ultimately agreed to negotiate with the ILA on those points. As a result, in 1972 an assessment formula clause was incorporated for the first time in the collective bargaining agreement, although the formula itself was similar in many regards to the one that NYSA had unilaterally

---

1. The main component of waterfront automation has been "containerization," the practice of loading and unloading cargo in huge containers rather than item by item. Containerization has engendered labor disputes, protests from non-automated ports, and an extended commercial struggle between "containerized" carriers and the conventional "breakbulk" operators. Mr. Justice Douglas' dissent in Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 295, 296–306, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968), contains an illuminating summary of the coming of maritime automation.

adopted in 1970. The clause, which is currently in effect, provides for the assessment of each ton of "non-excepted" cargo [2] loaded or discharged in the Port of New York during the period October 1, 1971–September 30, 1974 of an amount computed by deducting from the estimated total fringe liabilities the sum expected to be produced by a fixed man-hour assessment and dividing the remainder by the total estimated non-excepted tonnage. The excepted cargo is assessed purely on a man-hour basis [3]; a "Contract Board" composed of ILA and NYSA members sets the man-hour assessment rate for the excepted cargo. Automobiles, trucks and buses are also assigned a special assessment rate: 20% of the standard tonnage rate, measured by volume.[4] The tonnage assessment is collected by the direct employer from each of the carriers served by that employer and paid to NYSA for immediate transmittal to the NYSA–ILA Fringe Benefit Escrow Fund. The assessment formula also empowers the Contract Board to order a modification in the tonnage definition for any kind of cargo "when the request is properly supported by statistical or other proof." Other clauses in the collective bargaining agreement, which was executed by ILA and NYSA "for and on behalf of its employer members," provide that the agreement is binding on "each contracting stevedore and vessel carrier who directly or indirectly utilizes the services of any employers covered by this agreement and who by such execution binds itself and its successors to each and every term and condition of the agreement, including without limitation, the contribution of its proportionate share of the hourly and tonnage contributions provided herein, and no contracting stevedore shall perform services for any carrier, private or governmental, unless such carrier has subscribed to this agreement."

Seeking to avoid having to submit the agreement to the Federal Maritime Commission (FMC) for review, ILA and

---

2. The assessment formula provides that "[a]ll domestic cargo, all lumber at lumber terminals, bulk cargo (including scrap and sugar), and passengers and their personal baggage shall be deemed cargo excepted from the man-hour and tonnage assessments" set forth in the agreement. Domestic cargo is defined to exclude cargo moving to Puerto Rico, Hawaii and Alaska. In addition, a single ton of cargo is defined as 2,240 pounds or 40 cubic feet by measurement, whichever is greater.

3. Several of the intervenors, Transamerican Trailer Transport, Inc., Seatrain Lines, Inc., Sea-Land Service, Inc., and the Commonwealth of Puerto Rico protest the exclusion of the New York-Puerto Rico trade from "excepted cargo" classification. In addition, intervenor Daniels & Kennedy insists that newsprint should have been granted "excepted cargo" status. Both groups argue, essentially, that their cargoes had undergone modernization well before the assessment agreements were put into effect, and thus that they neither benefited from the ILA's concession to automation nor contributed to the loss of jobs occasioned by that concession. Therefore, they insist, it is unfair to assess them on a tonnage basis, rather than on a man-hour basis. The Commission ordered limited alterations in the predecessor assessment formula for both groups, Agreement No. T–2336—New York Shipping Ass'n Cooperative Working Arrangement, No. 69–57 (June 14, 1972), and the Court of Appeals for the D.C. Circuit affirmed that alteration, Transamerican Trailer Transport, Inc. v. FMC, 492 F.2d 617 (D.C.Cir. 1974). It would be inappropriate to determine these contentions on the limited issues of jurisdiction here tendered by the petitioners, although they will have to be considered after the FMC's final action or, perhaps, on the petitions challenging temporary approval, see fn. 6, *infra*, if these should be pressed.

4. Intervenor Wolfsburger Transport-Gesellschaft m.b.H., which transports the vehicles of its parent company, Volkswagenwerk Aktiengesellschaft, argues that while the 20% assessment rate appears favorable, it in fact imposes a disproportionate burden upon automobiles. In disapproving an identical assessment rate against automobiles in the predecessor agreement, T–2390, the Commission agreed that even a 20% rate imposes an unfair burden on automobile cargo. Agreement No. T–2336—New York Shipping Association Cooperative Working Arrangement, *supra*. The Court of Appeals upheld the Commission's modification, Transamerican Trailer Transport, Inc. v. FMC, *supra*. This, like the issues mentioned in fn. 3, is not properly before us now.

NYSA on July 31, 1972, filed a joint petition with the Commission for an order declaring that the assessment agreement was not subject to the filing or approval requirements of § 15 of the Shipping Act, 46 U.S.C. § 814.[5] In their petition, the parties alleged that the assessment formula was not an agreement between carriers, terminal operators, or other persons subject to the Act, and was therefore not within the scope of § 15. In addition, they argued that because the assessment arrangement was part of the collective bargaining agreement between NYSA and ILA, it was exempt from the provisions of the Act in all respects.

In lieu of acting directly on the petition for a declaratory order, the FMC issued an order, pursuant to § 22 of the Shipping Act, 46 U.S.C. § 821, requiring NYSA and ILA to show cause why the assessment agreement should not be held subject to § 15 and also in violation of §§ 16 First and 17, 46 U.S.C. §§ 815, 816, which prohibit discriminatory acts and rates. Nearly a year after the petition was filed and nine months after the order to show cause was issued, the FMC served a report and order. With one member dissenting, it found the assessment formula to be within the terms of § 15 as construed and applied in Volkswagenwerk Aktiengesellschaft v. FMC, *supra,* 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090. It also granted temporary approval to the formula. That approval, however, was made subject to any subsequent adjustments that might be found necessary in a separate proceeding, entitled New York Shipping Association—Man-Hour/Tonnage Assessment Formu-

la, Docket No. 73–34, which was instituted to determine the lawfulness of the formula under §§ 15, 16 First and 17. NYSA and ILA have petitioned to review the ruling that the FMC has jurisdiction to consider the legality of the assessment formula. The Department of Justice has joined the FMC in supporting the Commission's order but has annexed to its brief a contrary memorandum from the Department of Labor. Several other parties—carriers, stevedores and the Commonwealth of Puerto Rico—have intervened in support of the order.[6] The National Labor Relations Board has submitted an *amicus* brief on the side of the petitioners.

### I.

At argument we raised the question whether the FMC's ruling constituted a final order within the meaning of 28 U.S.C. § 2342(3) and requested supplemental briefs on that issue. Both petitioners and respondents submitted briefs urging an affirmative answer. We find the question very close.

The parties rely heavily on Mr. Justice Marshall's statement in Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970), that "the relevant considerations in determining finality are whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action." But it was much plainer in the *Marine Terminal* case that ap-

---

5. This reads in relevant part as follows:
   That every common carrier by water, or other person subject to this Act, shall file immediately with the Commission a true copy . . . of every agreement with another such carrier or other person subject to this Act, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, . . . in any manner providing for an exclusive, preferential, or cooperative working arrangement.

The statute further provides that "[a]ny agreement and any modification or cancellation of any agreement not approved, or disapproved, by the Commission shall be unlawful, and agreements, modifications, and cancellations shall be lawful only when and as long as approved by the Commission."

6. Several of the intervenors have filed a separate petition challenging so much of the order as granted temporary approval, but so far they have taken no steps to press the appeal.

plication of these criteria would sustain finality than it is here. In that case "there was no possible disruption of the administrative process; there was nothing else for the Commission to do." Here, by contrast, the Commission has only determined jurisdiction and granted temporary approval to the assessment formula; the investigation into the legality of the agreement is continuing, and it seems likely that, as was the case with the preceding formula, the agreement will expire before the Commission will have completed its review.[7] The other set of criteria offer petitioners no more help. The Commission's decision in *Marine Terminal* had the effect of imposing on carriers certain demurrage charges they had not theretofore borne; here it is still uncertain whether the levying of the tonnage assessment on the carriers will be sustained. We know only that the Commission has not decided whether or not it will be.[8]

The parties nevertheless insist that the order is one which determines certain rights and obligations and thus is final within such cases as Rochester Telephone Corp. v. United States, 307 U.S. 125, 143–144, 59 S.Ct. 754, 83 L.Ed. 1147 (1939), and Frozen Food Express v. United States, 351 U.S. 40, 44–45, 76 S.Ct. 569, 100 L.Ed. 910 (1956). The order in the *Rochester* case had far more immediate consequences than that here *sub judice*. Although in form it determined only that the Rochester was not within the intrastate exemption of § 2(b) of the Communications Act, 47 U. S.C. § 152(b), in effect that determina-

tion "necessarily and immediately carried direction of obedience to previously formulated mandatory orders addressed generally to all carriers amenable to the Commission's authority," 307 U.S. at 144, 59 S.Ct. at 764. *Frozen Food* is a step closer to the instant case. The ICC there found that specified commodities were not within the "agricultural" exemption from the requirement that motor carriers must possess a certificate or permit to engage in transportation of non-exempt goods. That finding had no economic effect, the Court noted, unless a carrier without an appropriate certificate or permit chose to carry products which the ICC had found not to be within the exemption. Nonetheless, the Court held it sufficient that the order, although merely declaratory, "touches vital interests of carriers and shippers alike and sets the standard for shaping the manner in which an important segment of the trucking business will be done." 351 U.S. at 44, 76 S.Ct. at 571. Here, so long as the temporary approval stands, the Commission's order does not make it unlawful for the parties to carry out the assessment formula, and the only inhibition imposed by the order is against the parties' modifying or cancelling the agreement, a course which they have indicated no desire to do. What may be more important—and the consideration that prompts us to hold the order reviewable—is the likelihood that before the Commission's investigation is concluded and judicial review can be had, NYSA and ILA will be bargaining for a new agreement; it is important

7. We see little force in petitioners' argument that the order sought to be reviewed terminated the proceeding initiated by the petitioners' request for a declaratory order and the FMC's order to show cause, and that the order should be deemed final for that reason. The effect of the Commission's action was the same as if the Commission had initiated a proceeding to determine whether the assessment formula should be approved, and had denied a motion by petitioners to dismiss the proceeding for lack of jurisdiction. Indeed, the order to show cause in-

cluded as issues whether the agreement should not be found to violate §§ 16 First and 17—issues which are currently under consideration in Docket No. 73–34.

8. The petition of certain intervenors to review so much of the order as grants temporary approval, see fn. 6, is a different matter, since that approval clearly had immediate economic effects. Petitioners here do not challenge the temporary approval and the other petitions are not presently before us.

for them to know whether any assessment formula that may be included therein will be subject to Commission review. This seems at least to approach the language quoted from *Frozen Food*. On that basis, although believing that the case is *sui generis* and that our decision goes to the verge,[9] we hold the order meets the requirement of finality.[10]

## II.

We find the merits considerably less difficult than the issue of reviewability; indeed, given the decision in *Volkswagenwerk, supra,* we see no need for making such heavy weather on the subject as the Commission did.[11]

■ The assessment agreement fits the definition of § 15 since it imposes obligations on common carriers by water and other persons subject to the Shipping Act, to wit, terminal operators, see 46 U.S.C. § 801. An agreement to which such persons are parties is not taken out of § 15 by the fact that persons not fitting that definition, to wit, stevedoring contractors who are not terminal operators, are also bound. *Volkswagenwerk* established that an agreement among water carriers, stevedoring contractors and terminal operators allocating assessments for benefits negotiated with a longshoremen's union requires approval under § 15. The FMC took jurisdiction of T–2390, the predecessor of the present assessment formula, apparently without objection, and directed certain modifications; its action has been sustained, without any suggestion that the FMC lacked jurisdiction over the agreement, in a comprehensive opinion by the District of Columbia Circuit, Transamerican Trailer Transport, Inc. v. FMC, *supra.* The petitioners urge that the present case is distinguishable on the basis that the agreements in *Volkswagenwerk* and *Transamerican Trailer Transport* were solely among stevedoring contractors, terminal operators and carriers, while the ILA took an active part in negotiating and is a party to the agreement here at issue. This is a distinction without a difference. To be sure, the FMC has no concern with so much of the agreement as provides what wages and other benefits shall be paid to the longshoremen, grievance procedures and similar matters. But even though we fully accept that the ILA has an important stake in the existence of a workable and reliable assessment formula, this does not relieve the FMC of its duty to determine whether the formula is reasonable in its effects on shipping. That inquiry is just as important as under the predecessor agreement and under the agreement in *Volkswagenwerk*. Similarly, the fact that the union has here succeeded in forcing NYSA to bar-

9. We fear that Mr. Justice Harlan would regard our decision as vindicating his prophecy, dissenting in *Frozen Food*, that the decision in that case "opens the door wide to premature judicial review of various kinds of administrative action," 351 U.S. at 48, 76 S.Ct. at 574. Professor Davis, however, enthusiastically supports *Frozen Food*, 3 Davis, Administrative Law Treatise § 21.07, at 170–72 (1958).

10. In Pepsico, Inc. v. FTC, 472 F.2d 179, 187 (2 Cir. 1972) and Ecology Action v. AEC, 492 F.2d 998, 1001–1002 (2 Cir. 1974), we indicated willingness to bestow the rubric of finality on an agency action refusing to dismiss "a proceeding that is plainly beyond its jurisdiction as a matter of law or is being conducted in a manner that cannot result in a valid order." This case does not approach that severe test.

11. The FMC seems to have been unduly cowed by the spanking administered in Boston Shipping Ass'n, Inc. v. United States, No. 72–1004 (1 Cir. May 31, 1972), where the court noted in dictum that its "initial reaction to the Commission's ruling [requiring filing of a collective bargaining agreement] is one of astonishment." The contract at issue in that case, however, was a collective bargaining agreement which related solely to the method of hiring longshoremen and contained no provision for imposing assessments on carriers or shippers. The Commission subsequently held that the agreement in that case did not fall within its jurisdiction under the Shipping Act, United Stevedoring Corp. v. Boston Shipping Ass'n, No. 70–3 (Aug. 25, 1972).

gain over the assessment formula does not by itself take the formula out of the reach of § 15. The union's achievement demonstrates its power to force this concession, but it does not dilute the magnitude of problems raised by the formula for shippers and carriers.

It is true that the formula agreed upon in this case does not impose direct assessments upon shippers, but that was also the case in *Volkswagenwerk*. The Court there thought it enough that the agreement would necessarily affect persons subject to the Shipping Act and ultimately would alter relations among shippers of various types of cargo.[12]

The FMC recognized that this was the heart of *Volkswagenwerk* when it wrote in its opinion sustaining jurisdiction in this case:

> In the final analysis, the nature of the activity must be scrutinized to determine whether it is the type of activity which attempts to affect competition under the antitrust laws or the Shipping Act. The impact upon business which this activity has must then be examined to determine the effect upon competition and whether any such effect is direct or remote. Ultimately the relief requested or the sanction imposed by law must then be weighed against its effect upon the collective bargaining agreement.

The Commission found that the assessment agreement affected competition directly and substantially, much as had the agreement in *Volkswagenwerk*. An estimated $100 million had to be raised

by the assessment scheme, and the formula agreed upon by the association and the union in effect determined how that expense would be divided among carriers utilizing different stevedoring techniques, and thus among different classes of shippers.

In his concurrence in *Volkswagenwerk*, Mr. Justice Harlan anticipated the problem raised here, and offered some guidance in resolving disputes that arise at the interface between NLRB and FMC jurisdiction. First, he warned against assuming that a maritime agreement "must always fall neatly into either the Labor Board or Maritime Commission domain." A single contract, he noted, "might well raise issues of concern to both." The Justice pointed out that multiemployer collective bargaining often presents conflicts between the policy favoring free labor-management bargaining and the policies against agreements that may restrain trade. In light of these countervailing policies, he concluded that the assessment agreement in *Volkswagenwerk* was not immune or exempt from FMC regulation, "for it raises 'shipping' problems logically distinct from the industry's labor problems." 390 U.S. at 286–287, 88 S.Ct. at 943. That is precisely the situation here. Because the Shipping Act problems clearly predominate over the labor interests raised by the assessment formula, we have no occasion to pass on the relevance or the appropriateness of the four specific criteria evolved by the FMC in defining a "labor exemption" under the Shipping Act.[13] It is enough that the

---

12. It is true that in all likelihood a substantial increase in wages or fringe benefits not incorporating an assessment formula would also be passed on by stevedoring contractors and terminal operators to water carriers and in turn to shippers in the form of general rate increases. What concerned the Court in *Volkswagenwerk* was that a formula faces stevedoring contractors and terminal operators with a choice either to pass on the assessment as such, with the possibility of disfavoring certain types of cargo, as the instant agreement requires up to the carrier stage, or to cease handling more heavily burdened cargo—in the present case cargo of high weight and low value.

13. In United Stevedoring Corp. v. Boston Shipping Ass'n *supra*, the Commission set out a four-part test to determine whether a particular agreement is entitled to a "labor exemption" from regulation under the Shipping Act. The four criteria were: (1) whether the collective bargaining that resulted in the agreement was in good faith; (2) whether the subject of the agreement is a mandatory subject of bargaining; (3) whether the agreement imposes terms on en-

Commission was correct in concluding that its regulation of the assessment formula would have a minimal impact on the collective bargaining process, while exempting the agreement from Shipping Act regulation would expose certain classes of shippers and carriers to potentially massive, inequitable cost increases.

Justice Harlan made a second point in his concurring opinion that provides further aid in reconciling the competing labor and Shipping Act policies. Even though a particular agreement may be within Commission jurisdiction, he said, "Commission review itself must be circumscribed by the existence of labor problems that it is not equipped to resolve." In the case of the *Volkswagenwerk* agreement, he noted that the Commission must start from the premise that "the obligation to collect the Mech Fund will be fulfilled; at issue will be only the propriety of the choice of the route to that objective." Plainly, the labor interests in the agreement do not evaporate upon a finding of FMC jurisdiction; those interests demand the Commission's continuing attention throughout the process of investigating the status of the agreement under §§ 16 and 17. In determining whether to approve the agreement, the Commission must be particularly sensitive to aspects

of the assessment scheme that have relatively more impact on the collective bargaining process and relatively less on competitive conditions in the industry. As the petitioners have repeatedly pointed out, the ILA's interest is primarily in assuring that the fringe benefit payments will be made; it has no proper concern over who makes the payments as long as they are forthcoming. The portion of the assessment formula allocating payment requirements, therefore, is farthest from the union's legitimate sphere of interest. The more vital portions of the agreement, so far as the union is concerned, are the provisions relating to the means by which the assessment obligations are to be collected.[14] Correspondingly, the allocation formula would seem to be of primary concern to the FMC, while the enforcement mechanism would appear to have substantially less potential effect on competitive conditions. In determining whether the agreement should be approved, disapproved or modified, the Commission must thus continue to weigh the Shipping Act and labor interests raised by different portions of the agreement and should move with caution in areas of greater collective bargaining concern.

The petitions to review are denied.

tities outside the collective bargaining unit; and (4) whether the union is acting in conspiracy with management, as defined in United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The Commission adhered to and applied those standards in this case, finding that the agreement dealt with a nonmandatory subject of bargaining and that the agreement imposed terms on persons outside the collective bargaining unit.

14. The portions of the assessment agreement relating to the collection scheme provide that all members of NYSA are bound by the agreement, all stevedores and car-

riers who utilize the services of NYSA members are bound by the agreement, that NYSA members must refuse services to any employers who refused to subscribe to the agreement, and that if any NYSA member provides services for an employer who does not pay the assessment obligation, the member will be required to pay the amount that is due. One indication of the union's relatively smaller interest in the actual allocation of assessments is that the 1972 allocation scheme was not changed from the one that NYSA had unilaterally adopted in 1970. Only the collection arrangements were altered in the collectively bargained formula.