**CONWAY CORPORATION et al., Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

**Arkansas Power & Light Company, Intervenor.**

**No. 73–2207.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 23, 1974.

Decided April 4, 1975.

Robert C. McDiarmid, Washington, D. C., with whom Sandra J. Strebel, Washington, D. C., was on the brief for petitioners.

John H. Burnes, Jr., Atty., F. P. C. with whom Leo E. Forquer, Gen. Counsel, and George W. McHenry, Jr., Sol., F. P. C., were on the brief for respondent.

Harry A. Poth, Jr., Washington, D. C., with whom Robert T. Hall, III, Washington, D. C., was on the brief for intervenor.

Before TAMM, LEVENTHAL and MacKINNON, Circuit Judges.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

LEVENTHAL, Circuit Judge:

In this case, we hold that the Federal Power Commission's jurisdiction to review a petition to set aside or reduce a utility's wholesale electric rate increase permits consideration of the utility's alleged purpose, and effect, to forestall its customers from competing with it at retail.

On May 31, 1973, Arkansas Power & Light (AP&L) filed with the FPC a wholesale rate proposal that would increase electricity rates to municipally owned systems by 22.6 percent, and to cooperatives by 34.9 percent. Petitioners are municipally owned and cooperative electrical systems that (a) purchase from AP&L all or a major portion of the electricity they resell to retail customers; and (b) compete with AP&L at retail for large industrial customers, and have historically been able to match AP&L tariffs for such loads. AP&L's filing would, in some cases, elevate its wholesale rates to petitioners above its retail rates, thus making it impossible for peti-

tioners to maintain parity with AP&L in competing for retail customers.

Petitioners filed a timely Protest, Motion to Reject, and Petition to Intervene, with the Commission. They alleged, *inter alia*, that AP&L's increase in wholesale prices represented "an attempt to squeeze petitioners or some of them out of competition, and to make them more susceptible to the persistent attempts of the company to take over the publicly owned systems in the State," [1] and asked that the proposed rate increase be rejected.

The FPC, by Order of July 31, 1973, accepted, and suspended until January 1, 1974, the proposed rate schedule. Intervention by Petitioners was limited to matters other than the alleged discrimination. In its Order denying intervention on this question the Commission referred to its earlier order in Indiana & Michigan Electric Co., 49 FPC 1232 (1973), which set minimum standards that must be met before protestants can obtain intervention and hearing on anticompetitive issues and avoid disposition made summarily: The petition must clearly specify "1) the facts relied upon, 2) the anti-competitive practices challenged, and 3) the requested relief which is within this Commission's authority to direct." Petitioners, the FPC held, had failed to meet the third criterion.

Petitioners' Amended Petition to Intervene asked that the proposed wholesale rates be reduced to eliminate the price squeeze. It was denied by a Commission order of October 29, 1973, on the same ground. The FPC clarified its former order by characterizing petitioners' suggested relief as "a rate related not to wholesale costs but rather related to [AP&L's] industrial rates," which are not within the Commission's jurisdiction.[2] A subsequent petition for rehearing was denied, and a petition for review was filed in this court.

We hold that the FPC has jurisdiction to consider anti-competitive allegations of the sort raised by petitioners and indeed must consider them in determining whether the rate proposed by AP&L is a "just and reasonable" rate.

## I. FINALITY OF ORDER BELOW

■ The Commission contends that the order denying intervention on this issue was not of the "definitive character" required by section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b) (1970), as construed in FPC v. Metropolitan Edison Co., 304 U.S. 375, 384, 58 S.Ct. 963, 82 L.Ed. 1408 (1938). Although petitioners have been allowed to intervene in the Commission hearing to raise other, unrelated challenges to the proposed schedules, we find this an appropriate order for review at this time.

■ We may profitably follow the lead of the Supreme Court in defining finality in "pragmatic" terms. *See* Cox Broadcasting Corp. v. Cohn, —— U.S. ——, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). We are to make "a realistic appraisal of the consequences" of the challenged action.[3] An order is reviewable when it "impose[s] an obligation, den[ies] a right or fix[es] some legal relationship." [4] We look to whether there has been "an effective deprivation of [petitioners'] rights." [5] We find the order denying intervention here so definitive in character and of such a significant and immediate impact on petitioners as to meet this criterion.

Petitioners raise a question of law, which will not be better defined by fur-

1. Petitioners' Protest, Motion to Reject, and Petition to Intervene, June 28, 1973, J.A. 8.

2. Order of October 29, 1973, Denying Amended Petition to Intervene and Clarifying Prior Order, J.A. 102.

3. Isbrandtsen Co. v. United States, 93 U.S. App.D.C. 293, 297, 211 F.2d 51, 55, cert. denied sub nom. Japan-Atlantic & Gulf Confer-

ence v. United States, 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954).

4. Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948).

5. National Airlines, Inc. v. CAB, 129 U.S.App. D.C. 180, 187, 392 F.2d 504, 511 (1968), cited in Thermal Ecology Must Be Preserved v. AEC, 139 U.S.App.D.C. 366, 368, 433 F.2d 524, 526 (1970).

ther development of the record. The FPC has taken a firm position that petitioners have no legal right to FPC consideration of their antitrust allegations. Because it sees the bar to be jurisdictional, the FPC considers the issue closed. It is not deferring consideration of the question [6] or considering the matter in other proceedings.[7] On the contrary, the Commission has repeatedly refused in other proceedings [8] to consider similar allegations. Thus, we are presented with a definitive administrative conclusion on a recurring question of law that will shape numerous unrelated proceedings if judicial review is deferred. Disruption of the orderly process of adjudication is a factor to be considered.[9] But our review now on this point does not interfere with the FPC's conduct of the proceeding it has already put under way.

There is a need here for swift resolution of the anti-competitive jurisdictional issue, not only because it is recurring, but because the FPC's determination has a substantial and immediate impact on the parties that cannot be remedied by subsequent agency action.[10] The competitive context in which petitioners operate sets the stage for our analysis. In competing with supplying companies, municipal and cooperative systems seek to maintain customer satisfaction with the quality and price of their service in order to attract new industries and to retain existing customers; continued satisfaction is also necessary to ensure voter support for the municipal systems. At its most basic level, this competition represents a struggle on the part of the municipal and cooperative systems to preserve their independence from their supplier insofar as they compete at retail. The context has been described by Professor Meeks in Concentration in the Electric Power Industry: The Impact of Antitrust Policy, 72 Colum.L.Rev. 64, 78 (1972):

> To illustrate, assume that a municipal system is buying all or most of its power from a neighboring private system. There exists between the two an indirect, but very real competition to serve both areas. Unless the municipality has access to alternative sources might well decide to allow the system that furnished the cheapest power to serve both areas. Unless the munciipality has access to alternative sources of economical power . . . the neighboring system can virtually control the performance of the municipal system through its control over the wholesale price of power. . . . Such control by selling systems is probably very common and very effective, primarily because of the almost universal control over transmission by the dominant selling system in an area. This kind of "unfair" competition is usually directed at municipals and cooperatives but also occasionally at small private systems, particularly when the seller is seeking to absorb the smaller system by merger.[11]

6. *Compare* Overseas National Airways, Inc. v. CAB, 426 F.2d 725 (2d Cir. 1970), where the court refused to review a refusal by the CAB to expand the scope of a proceeding concerning transatlantic passenger charter authority to include the issue of transatlantic cargo charter authority. The court stressed that the CAB had not suggested that the excluded issue would remain closed indefinitely, but had merely deferred consideration. 426 F.2d at 727–28.

7. *Compare* Ecology Action v. AEC, 492 F.2d 998, 1001 (2d Cir. 1974).

8. *E. g.*, Southern California Edison Co., 50 F.P.C. 836 (1973); Florida Power & Light Co., 50 F.P.C. 1626 (1973); Order of January 3, 1974, in Union Electric Co., Docket No. E–8215; Opinion No. 681 of January 7, 1974, in Commonwealth Edison Co., Docket No. E–7578; Order of February 28, 1974, in Public Service Co. of Oklahoma, Docket No. E–8242; Order of March 14, 1974, in Pacific Gas & Electric Co., Docket No. E–777; Order of April 19, 1974, in Wisconsin Electric Co., Docket No. E–8619.

9. Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970).

10. *Cf.* Atlanta Gas Light Co. v. FPC, 476 F.2d 142, 147 (5th Cir. 1973).

11. *See also* Hearings on S. 218 Before the Senate Comm. on Commerce, 89th Cong., 1st Sess., ser. 89–38, at 68 (1965):

> To the large privately-owned electric utility a retail customer, even a large industry, is

Through its position as supplier, AP&L will be able, if there is no FPC jurisdiction to consider the public interest in AP&L's discriminatory levels, to affect the quality and price of petitioners' retail service in such a way as to tilt the scales of competition in its favor.

The refusal of the FPC to consider discriminatory treatment between jurisdictional and nonjurisdictional rates will inevitably and immediately affect the context in which long-term contracts will be bargained for, and relatively irrevocable location decisions will be made by potential industrial customers. Judge Friendly has found—we need not go so far—these considerations determinative of the question of finality even where the agency has held that it has jurisdiction and is continuing to investigate an issue on its merits.[12]

The immediate effect of the FPC's order on the shape of decision-making in the industry is not gainsaid by the possibility that the FPC may set aside the wholesale rate increase in the rate proceeding, and order a refund of overcharges made after the suspension terminated. First, such relief would in a sense be adventitious, and totally divorced from any consideration of the discrimination problem that is claimed to be part of the public interest. Second, the discriminatory charges may last for years before the wholesale rate is reduced, if it is reduced, on other grounds. The initial rate filing in this case, for example, was made on May 31, 1973, and hearings are still being held. Third, the potential discriminatory impact is not limited to the parties in this proceeding, but affects the competitive relationship of suppliers and customer-competitors throughout the country.[13]

█ The FPC contends that petitioners are not injured because they can still raise "valid" anticompetitive issues—those regarding discriminatory treatment between wholesale customers—in the Commission proceeding. This begs the question: It is clear that the Commission will not consider the claims that are raised by petitioners and will not give them the protection they request and may need. Indeed, if we were to peek ahead into the merits to decide jurisdiction, this case would be more appropriate for sustaining jurisdiction on the ground of the strong likelihood of reversal.[14]

## II. MOOTNESS

On March 18, 1974, AP&L filed an application for a 22.6 percent increase in its

---

simply a customer. However, a wholesale customer is frequently also a competitor, actual or potential. The customer at wholesale may not only be a competitor in the fringe area where the two systems are contiguous, but may also be a direct or potential competitor for the commercial and industrial businesses that are able to take costs and conditions of electric service into account in deciding where to locate and which power supplier to patronize.

The electric power wholesaler may in fact be seeking to put the retailer out of business. This is not merely theoretical. Every year many municipal systems succumb to purchase offers by investor-owned wholesale suppliers.

12. [T]he Court held it sufficient that the order, although merely declaratory, "touches vital interests of carriers and shippers alike and sets the standard for shaping the manner in which an important segment of the trucking business will be done." . . . [T]he consideration that prompts us to hold the order reviewable—is the likelihood that before the Commission's investigation is concluded and judicial review can he had, NYSA and ILA will be bargaining for a new agreement; it is important for them to know whether any assessment formula that may be included therein will be subject to Commission review. New York Shipping Ass'n v. FMC, 495 F.2d 1215, 1219–20 (2d Cir. 1974), quoting Frozen Food Express v. United States, 351 U.S. 40, 44, 76 S.Ct. 569, 100 L.Ed. 910 (1956).

13. See, e. g., cases cited in note 8 supra.

14. Jurisdiction to review exclusionary rulings may be sustained even absent significant injury where, in the words of Judge Friendly, the agency's ruling is "so flagrantly wrong and demonstrably critical as to make it apparent that the agency is not merely courting the possibility of reversal but is running into the certainty of it if the ultimate decision should be against the proponent of the evidence." Ecology Action v. AEC, supra, 492 F.2d at 1001.

retail electric rates with the Arkansas Public Service Commission. We cannot remand for consideration of this changed factual situation unless we order a reversal of the FPC, since, unreversed, the FPC will abide by its determination that it lacks jurisdiction to consider such factual allegations. Without further factual consideration by the Commission we are unable to evaluate whether the question has been mooted by AP&L's state application, particularly in light of petitioners' contentions that the proposed retail rate increase is not sufficiently great and that AP&L has indicated that it intends to file a second wholesale increase.

### III. THE MERITS

#### A. The Statute

All parties agree that the FPC has the authority to weigh certain allegations of anticompetitive effects, and is indeed required to do so. The "important and broad regulatory power" vested in the Commission by Title II of the Public Utility Act of 1935, 49 Stat. 803, was recently described by the Supreme Court in Gulf States Utilities Co. v. FPC, 411 U.S. 747, 758–59, 93 S.Ct. 1870, 1878, 36 L.Ed.2d 635 (1973), as "clearly carr[ying] with it the responsibility to consider, in appropriate circumstances, the anticompetitive effects of regulated aspects of interstate utility operations pursuant to . . . directives contained in §§ 205, 206 [16 U.S.C. §§ 824d, 824e (1970)] . . . ." See also Otter Tail Power Co. v. United States, 410 U.S. 366, 373–74, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); City of Huntingburg v. FPC, 162 U.S.App. D.C. 236, 241–242, 498 F.2d 778, 783–84 (1974). Gulf States Utilities and Otter Tail, like the present case, concerned alleged anticompetitive efforts by utilities engaged in wholesale and retail sales to squeeze municipal systems and rural cooperatives that both competed with and purchased power from them. In Gulf States certain cities protested, under § 204 of the Federal Power Act, 16 U.S.C. § 824c (1970), a utility's application for authority to issue bonds; the cities alleged that the proceeds from the proposed bonds would be used to finance anticompetitive activities. Otter Tail was a civil action under § 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U.S.C. § 2 (1970), based on various alleged anticompetitive activities—such as refusals to sell, refusals to wheel, the institution of litigation, and the denial of access to other suppliers by means of Otter Tail's transmission systems—directed against existing and proposed municipal systems. Neither case raised the issue, now before this court, of discriminatory effects caused by differences between wholesale and retail rates.

Sections 205 and 206 of the Federal Power Act, which were passed as part of Title II, expressly require the Commission to weigh discriminatory effects in rate proceedings. Section 205(b), 16 U.S.C. § 824d(b) (1970), prohibits any public utility, "with respect to any transmission or sale subject to the jurisdiction of the Commission," from maintaining "any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of services."[15] Section 206(a), 16 U.S.C. § 824e(a) (1970), requires the FPC to determine the just and reasonable rate whenever it, after a hearing, finds that the rate demanded "by any public utility for any transmission or sale subject to the jurisdiction of the Commission . . . is unjust, unreasonable, unduly discriminatory or preferential."[16]

---

**15.** Section 205(b) states in full:

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other

respect, either as between localities or as between classes of service.

**16.** Section 206(a) provides, in full:

Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdic-

■ The question presented here is whether the FPC's authority, and responsibility, under §§ 205 and 206, extend to claims of discrimination between rates for two classes of service, only one of which is "subject to the jurisdiction of the Commission."

The FPC and AP&L contend that the Commission cannot grant the relief requested by petitioners because it only has jurisdiction over the wholesale sale. In support of their argument, they point to the Congressional hearings on the Federal Power Act,[17] which suggest that the phrase "subject to the jurisdiction of the Commission" was added to § 205(b) in response to a request by the National Association of Railroad and Utilities Commissioners, which sought to avoid giving the FPC the "power over intrastate rates" that the Supreme Court, in Houston, East and West Texas Rwy. Co. v. United States (Shreveport Case), 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914), found had been granted to the Interstate Commerce Commission. During the floor debates Representative Cole of Maryland explained the action of the House Committee in safeguarding the jurisdiction of the states: "[W]e have tried—and I think successfully—to avoid the injection into the Federal control, which this title confers, the extension thereof into intrastate activities in the way that the Shreveport case might permit." [18]

The "power over intrastate rates" and "the extension [of Federal control] into intrastate activities" that the *Shreveport* case permitted to the ICC goes far beyond the relief sought by petitioners, for the Supreme Court in *Shreveport* upheld the power of the ICC to combat discrimination under § 3 of the Interstate Commerce Act of 1887, ch. 104, 24 Stat. 379, 380, by issuing an order directed toward *intrastate* rates—in that case an order that would permit carriers to increase their intrastate rates above the level approved by the state commission.[19] Petitioners do not ask the FPC to modify or to authorize the modification of retail rates. They have only asked that the *interstate* rate increase proposed by AP&L be rejected[20] or reduced[21] if the anticompetitive allegations are found to have merit. The legislative history is not adverse to FPC jurisdiction in the case at bar, particularly when it is taken in the context of the broadly procompetitive purposes of Title II.

■ Turning to text, a common sense reading of the statutory language reveals no requirement that both rates involved in a pattern of discrimination fall within the jurisdiction of the Commission. If Congress had intended so to limit the reach of the statute it could have prohibited the maintenance of unreasonable differences in rates "between classes of service subject to the jurisdiction of the Commission." A fair interpretation of the statute as it is drafted is, instead, that any sanction imposed by the FPC to remedy an anticompetitive practice is to be addressed to the jurisdictional rate, and that any discrimination in rates that does not involve jurisdictional service, *i. e.,* discrimination between nonjurisdictional classes of service, is left completely to the state regulatory bodies.

tion of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.

17. Hearings on H.R. 5423 and S. 1725 Before the Comm. on Interstate and Foreign Commerce, 74th Cong., 1st Sess., pt. 3, at 1624 (1935). *See also id.,* pt. 1, at 503; H.R.Rep. No. 1318, 74th Cong., 1st Sess. 8 (1935).

18. 79 Cong.Rec. 10384 (1935).

19. The development of federal regulation of intrastate rates after *Shreveport* is discussed by Justice Frankfurter in his dissent in Public Service Commission v. United States, 356 U.S. 421, 429, 430–34, 78 S.Ct. 796, 2 L.Ed.2d 886 (1958).

20. Petitioners' Protest, Motion to Reject, and Petition to Intervene, June 28, 1973, J.A. 29.

21. Petitioners' Amended Petition to Intervene, August 22, 1973, J.A. 93.

■ The FPC's position would leave a regulatory gap—no institution would have authority to consider an undue preference between wholesale and retail rates, even where that preference was deliberately instituted for the purpose of clogging competition, and to reduce interstate wholesale rates. A legislative intention to achieve such a regulatory gap is not to be presumed unless expressly presented. United Gas Improvement Co. v. Continental Oil Co., 381 U.S. 392, 85 S.Ct. 1517, 14 L.Ed.2d 466 (1965); Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 682–83, 74 S.Ct. 794, 98 L.Ed. 1035 (1954).

■ On the issue before us, we see a statute that confers plenary jurisdiction to review the interstate wholesale rate and to provide relief addressed to such wholesale rate in order to further the public interest. The Commission has latitude to address the matter in consultation with, and after joint hearings with, the state commission. But it cannot wash its hands of the public interest problem as one totally beyond its jurisdiction.

### B. Ability of FPC to Consider and Investigate Nonjurisdictional Matters

This interpretation of §§ 205 and 206 may on occasion require the FPC to consider AP&L's retail rate structures. FPC contends this "would result in this Commission interjecting itself into an area in which it has no jurisdiction." [22] However, the FPC concedes that it is authorized to consider nonjurisdictional matters when necessary to the exercise of its jurisdictional authority. As it acknowledges in its brief, "[l]ike Section 5(a) of the Natural Gas Act, Section 206(a) of the Federal Power Act authorizes the Commission to consider retail costs. And, . . . Section 206(b) specifically authorizes the Commission to undertake an investigation into certain nonjurisdictional sales." [23]

■ Interpreting § 5(a), the Supreme Court has held that "[t]he Commission, while it lacks authority to fix rates for direct industrial sales, may take those rates into consideration when it fixes the rates for interstate wholesale sales which are subject to its jurisdiction." Panhandle Eastern Pipe Line Co. v. FPC, 324 U.S. 635, 646, 65 S.Ct. 821, 827, 89 L.Ed. 1241 (1945). In Panhandle Eastern, the Court reviewed a rate proceeding in which the Commission had examined a utility's retail business in order to allocate earnings between the regulated and unregulated business. That case is distinguishable, to be sure, but the underlying principle is one that permits the FPC to consider matters which would be completely nonjurisdictional taken by themselves, but are appropriate for consideration when germane to the meaningful execution of a jurisdictional function.

■ There are further indications that the Federal Power Act does not contemplate that the FPC is to operate in an airtight chamber, insulated from nonjurisdictional factors. In presenting Title II, the House Committee expressly said: "The new parts . . . contain throughout direction to the Federal Power Commission to receive and consider the views of State commissions." [24] Numerous statutory provisions implement this vision, authorizing the Commission to consider nonjurisdictional factors and to cooperate with state regulatory authorities. Section 209(b), 16 U.S.C. § 824h(b) (1970), permits the Commission to confer with any state commission "regarding the relationship between rate structures, costs, accounts, charges, practices, and regulations of public utilities subject to the jurisdiction of such State Commission and of the Commission," and to hold joint hearings with the state authorities. Section 311, 16 U.S.C. § 825j (1970), authorizes and directs the FPC "to conduct investigations regarding the generation, transmission, distribution,

---

22. Order of October 29, 1973, Denying Amended Petition to Intervene and Clarifying Prior Order, J.A. 102.

23. FPC Br. at 31.

24. H.R.Rep.No.1318, 74th Cong., 1st Sess. 8 (1935).

and sale of electric energy . . . whether or not otherwise subject to the jurisdiction of the Commission, including the generation, transmission, distribution, and sale of electric energy by any agency, authority, or instrumentality . . . of any State or municipality or other political subdivision of a State." *See also* § 202(a), 16 U.S.C. § 824a(a) (1970), which requires the FPC to give notice to state commissions and "afford each such State commission reasonable opportunity to present its views and recommendations, and . . . receive and consider such views and recommendations" before it establishes any regional district for the coordination and interconnection of electric facilities; and § 302(b), 16 U.S.C. § 825a(b) (1970), which has a similar provision with regard to the fixing by the FPC of rates of depreciation for licensees and public utilities.

In other contexts, the Commission has embraced its responsibility to consider intrastate rate relationships that touch on rate proceedings within its jurisdiction. For example, in Southwestern Public Service Co., 33 FPC 343 (1965), the Commission compared the conditions under which a utility's various wholesale customers rendered retail service in order to evaluate whether differences proposed in wholesale rates—different rates to investor-owned wholesale customers and to cooperative wholesale customers —"would seriously prejudice the competitive business relationships" between customers in the two groups. 33 FPC at 350.

## C. Authority of the FPC to Grant the Remedy Requested

■ The Commission has the authority under § 206 to take unduly discriminatory effects into account in determining a just and reasonable wholesale rate, Gulf States Utilities Co. v. FPC, *supra.* This is the relief that petitioners seek.

They do not ask the FPC to increase or decrease nonjurisdictional retail rates, but only to consider the evidence presented by the wholesale customers and, if anticompetitive effects are found to exist, to modify the concededly jurisdictional rates proposed by AP&L to the extent appropriate.[25]

■ The FPC erroneously construes the petition to intervene as requesting the Commission to "subordinate [its] jurisdiction to that of the state commissions by basing wholesale rates on retail rates."[26] Petitioners do not ask that the Commission subordinate its discretion to the state commissions or even that it tie the wholesale rate to the retail rate. Rather, they ask the Commission to consider their allegations of anticompetitive conduct, if established, as a factor in deciding whether the proposed rate is just and reasonable, as it does when allegations of anticompetitive effects between two jurisdictional rates are raised. Northern Natural Gas Co. v. FPC, 130 U.S.App.D.C. 220, 225, 399 F.2d 953, 958 (1968). The retail rates charged by AP&L in a market in which it is competing with its own customers are part of the factual context in which the proposed wholesale rate will function; they do not set an authoritative standard for what is a just and reasonable wholesale rate.

The Commission further contends that it cannot grant petitioners' requested relief because "[w]holesale rates must recover allocated wholesale costs"[27] and petitioners suggest "that the Commission reduce the proposed wholesale rates without regard to costs."[28] Because the Commission has raised a jurisdictional bar and refused to investigate petitioners' allegations, we cannot, at this stage, determine whether a wholesale rate low enough to abolish any discriminatory effects would fail to recover allocated wholesale costs. By arguing that any

25. Petitioners' Amended Petition to Intervene, August 22, 1973, J.A. 93; Petitioners' Petition for Rehearing, November 5, 1973, J.A. 116.

26. Order of December 5, 1973, Denying Petition for Rehearing, J.A. 119.

27. Order of October 29, 1973, Denying Amended Petition to Intervene and Clarifying Prior Order, J.A. 102.

28. FPC Br. at 32.

consideration of noncost factors to reduce a proposed rate necessarily produces a rate that fails to recover allocated costs, the Commission seems to assume that there is a single cost-recovering rate. Rather, there is a zone of reasonableness:

> Statutory reasonableness is an abstract quality represented by an area rather than a pinpoint. It allows a substantial spread between what is unreasonable because too low and what is unreasonable because too high. To reduce the abstract concept of reasonableness to concrete expression in dollars and cents is the function of the Commission. It is not the disembodied "reasonableness" but that standard when embodied in a rate which the Commission accepts or determines that governs the rights of buyer and seller.[29]

When costs are fully allocated, both the retail rate and the proposed wholesale rate may fall within a zone of reasonableness, yet create a price squeeze between themselves.[30] There would, at the very least, be latitude in the FPC to put wholesale rates in the lower range of the zone of reasonableness, without concern that overall results would be impaired, in view of the utility's own decision to depress certain retail revenues in order to curb the retail competition of its wholesale customers.

The case is remanded for further proceedings not inconsistent with this opinion. To avoid any possibility of misunderstanding, we expressly note that we do not intend any indication whether petitioners are entitled to relief on the merits, and we specifically note that on the remand the Commission will have full latitude to consider the significance

of AP&L's rate changes subsequent to the Commission's order (of October 29, 1973) rejecting Petitioners' proposed submissions.

So ordered.

---

29. Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 251, 71 S.Ct. 692, 95 L.Ed. 912 (1951) (Jackson, J.).

30. The FPC has acknowledged its ability to deal with this situation:

> It occurs to us that one rate in its relation to another rate may be discriminatory, although each rate *per se*, if considered independently, might fall within the zone of reasonableness. There is considerable latitude within the zone of reasonableness insofar as the level of a particular rate is concerned. The relationship of rates within such a zone, however, may result in an undue advantage in favor of one rate and be discriminatory insofar as another rate is concerned. When such a situation exists, the discrimination found to exist must be removed.

Otter Tail Power Co., 2 FPC 134, 149 (1940).